1

2

3

4

5

6

7           IN THE UNITED STATES DISTRICT COURT

8         FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10   SEAN PRYOR,                          No. C 11-0954 CW

11           Plaintiff,                   ORDER GRANTING IN
                                          PART AND DENYING
12        v.                              IN PART
                                          DEFENDANTS' MOTION
13   CITY OF CLEARLAKE, a governmental    FOR  SUMMARY
     entity; CARL MILLER,                 JUDGMENT (Docket
14   individually, and in his capacity    No. 56)
     as a police officer for the City
15   of Clearlake and acting sergeant;
     ALAN WADE McCLAIN, individually
16   and in his capacity as Chief of
     Police for the City of Clearlake;
17   CRAIG CLAUSEN, individually and
     in his capacity as Police
18   Lieutenant for the City of
     Clearlake; MICHAEL RAY,
19   individually, and in his capacity
     as a police officer for the City
20   of Clearlake; and DOES 1-50,
     individually, and in their
21   capacity as police officers for
     the City of Clearlake,
22
             Defendants.
23   _____/

24

25       This action arises from an incident in which Plaintiff Sean

26   Pryor, a mentally ill, African American man, was shot and tased by

27   officers from the Clearlake Police Department.

28

**United States District Court**
For the Northern District of California

Pryor has alleged the following causes of action under federal and state law in his First Amended Complaint: (1) a claim under 42 U.S.C. § 1983 against all Defendants for deprivation of his constitutional rights under the Fourth Amendment and due process, equal protection and privacy principles; (2) a claim against the City and Chief Alan Wade McClain under § 1983, pursuant to Monell v. Department of Social Services, 436 U.S. 658 (1978); (3) a claim for assault and battery against Defendant police officers; (4) a claim for intentional infliction of emotional distress against Defendant police officers; (5) a claim for negligence against Defendant police officers; (6) a common law claim against the City and Chief McClain for negligent hiring, training, supervision and discipline; (7) a claim under California Civil Code section 52.1 against Defendant police officers; (8) a claim under California Civil Code section 51.7 against Defendant police officers; (9) a claim against the City for violation of the Americans with Disabilities Act; and (10) a claim against the City under the Rehabilitation Act.

Defendants have jointly moved for summary adjudication in their favor of all of Pryor's claims, except that the motion does not request adjudication of his excessive force claim against Officer Carl Miller. Pryor has not opposed the motion with respect to his fourth through tenth causes of action.

Having considered all of the parties' submissions and oral argument, the Court grants Defendants' unopposed motion for summary judgment with respect to Pryor's fourth through tenth claims. The Court grants in part and denies in part Defendants'

motion as to Pryor's claims under § 1983 and for assault and battery.

BACKGROUND

The incident at issue in this case took place on September 30, 2009 at the residence Pryor shared with his mother in Clearlake.  Officer Carl Miller[1] received a call while he was with Officer Ryan Peterson.  Miller was informed that Pryor had threatened and battered his younger brother Darryl Ayatch and was possibly armed and under the influence of drugs.  Allen Dec., Ex. C, Miller Dep. at 50:18-51:11.  He was informed that the call was an "H&S, which is basically health and safety, which means drugs and/or alcohol," that Pryor had had previous contact with officers when he had brandished a weapon and resisted arrest, and that a machete could be in the house.  Id. at 54:4-19.

Miller and Peterson were the first to arrive at the scene. Miller saw beer cans, shoes, a TV, stereos and a door with several holes in it thrown about the front yard.  Id. at 58:12-16.  He and Peterson did not know whether all of the broken debris in the yard was the result of Pryor's agitation, but considered it a "sign." Id. at 65:11-14.  He heard something thrown against the wall inside the house with enough force that stucco fell off the wall outside of the house.  Id. at 61:3-10.  Pryor was screaming something indiscernible.  Id. at 61:15-19.

Peterson announced their presence as the Clearlake Police Department.  Id. at 64:2-3.  Pryor responded, "Go away!"  Peterson

---

[1] An officer Todd Miller also figures in the case but is not a defendant.  He will be referred to by his full name.

United States District Court
For the Northern District of California

Body Recording (Peterson Rec.), 1:36;[2] Pryor Transcript of

Peterson Body Recording (Peterson Rec. Tr.) at 7:17-19.[3]  When

Peterson asked Pryor if he could talk to him for a minute, Pryor

responded, "[F]uck you."  Allen Dec., Ex. C, Miller Dep. at 64:12-

15.  In response to Peterson's request that Pryor come to the

door, Pryor responded a couple of times, "'[S]uck my dick, fuck

you, come on in.'"  Id. at 63:15-18.  Pryor became more

aggressive.  He told the officers, "I'll fucking kill you, you

know, or you're going to have to kill me."  Id. at 65:23-66:1.

Peterson's body recorder also captured the following

statements from Pryor:

[2] Defendants object to Pryor's reliance on portions of
Peterson's body recording, as well as the taser video recording,
the audio recording of Ayatch's 911 call and audio recordings of
the investigative interviews with the officers after the shooting.
Under Federal Rule of Evidence 106, upon which Defendants rely, if
a party introduces all or part of a writing or recorded statement,
an adverse party may require the introduction, at that time, of
any other part--or any other writing or recorded statement--that
in fairness ought to be considered at the same time.  Because
Pryor has filed with his opposition a DVD containing a complete
copy of Peterson's body recording and Ayatch's 911 call, as well
as of the recordings of the taser video and of the post-incident
interviews with Miller, McClain, Ray, Peterson and Clausen, the
Court considers this evidence.  Defendants have not challenged the
authenticity of these recordings or submitted their own copies of
the recordings.

[3] Pryor submitted a transcript of Peterson's body recording.
Defendants objected to the transcript as unauthenticated and
lacking foundation.  At the hearing the parties stipulated to
submit jointly an agreed upon transcript of the body recording.
The parties subsequently submitted, in a single document, their
respective transcriptions of the body recording, highlighting
several discrepancies between their versions.  Docket No. 75.
Because the Court must construe the facts in favor of Pryor in the
context of Defendants' motion for summary judgment, where there
are disputes regarding the content of the recording, the Court
draws from Pryor's transcript, so long as it arguably conveys the
audio recording.

**United States District Court**
For the Northern District of California

1
2
3
4
5
6

> [C]ome and fuckin' [inaudible]-- die!  You aint gettin
> in, come in and you're going to fuckin die . . . I
> ain't gonna give up this time.  You guys can't do this
> ya'll are gonna have to burn me.  You guys are gonna
> have to shoot me . . . Do you wanna die?  You gonna
> have to [Laughing] . . . I'm from New York; I could
> kill you all with my bare hands with just one
> punch . . . What's in your DNA?  What makes you tick,
> really?  Tell me.  [Inaudible] who y'all really.  Are
> you aliens?

7

Peterson Rec. Tr. at 2:8-3:26; Peterson Rec., 3:17-5:06.

8
9
10

    Lieutenant Craig Clausen and Chief McClain arrived, then

Officer Michael Ray and a Detective Snyder, whose first name is

not provided.  Allen Dec., Ex. C, Miller Dep. at 66:3-8; 67:5-10.

11

    Ayatch, in tears, told Peterson as follows:

12
13
14
15
16
17
18
19

> I came here, and my brother has been acting funny.
> He's already been taken down in the house, he's on
> some kinda drugs, my mother had to leave . . . He's
> still going to Trial [sic] for the last time that he
> messed up . . . He got a hold of some bad drugs, and
> you guys had to come Taser him a couple of times for
> brandishing a knife . . . She told me she [inaudible]
> but she couldn't take it, so I decided to come and see
> how everthings is doing . . . I went in, like--"What
> the hell do you want muthafucka?  I'll kill you!  I'll
> kill you!" and then he showed me a stick.  He says, "I
> whipped that bitch ass over there and made her suck my
> dick, and I'ma beat yo ass and make you suck my dick!
> I'ma kill yo mutha fuckin ass."

20
21

Peterson Rec. Tr. at 7:17-19, 8:27-9:7; Peterson Rec., 13:28-
14:48.

22

    Ayatch told Peterson that he was afraid for his life.

23
24
25
26
27

Peterson Rec. Tr. at 9:9-11; Peterson Rec., 14:56-14:59. Ayatch

also referred to the residence as his mother's house, said that

Pryor currently lived there, and said that he himself was a former

resident but could go to the house "whenever [he] want[ed] to,

everyday."  Peterson Rec. Tr. at 7:15-23, 9:18-19; Peterson Rec.,

28

14:08-25;[4] 15:00-15:10.  He said that his mother "didn't ask me to come but sometimes she'll say go talk to your brother."  Peterson Rec. Tr. at 9:20-21; Peterson Rec., 15:10-15:12.  Ayatch then offered Peterson a key to the residence.  Peterson Rec. Tr. at 9:27-28; Peterson Rec., 15:17-20.

Pryor's transcript of Peterson's body recording indicates that Peterson relayed to other officers some of Ayatch's statements, although the listeners are not identified.  Peterson reported,

> He says he doesn't live here, he came here because his mom asked him to check -- to talk to his brother. He comes here quite often, he has a key to the residence -- um -- came in, noticed many -- showed up noticed the door from inside the residence out here.

Peterson Rec. Tr. at 10:10-16; Peterson Rec., 15:40.

Miller testified in his deposition that Peterson told him, Ray and Snyder that Ayatch's mother lived at the house and had left the night before, and that when Ayatch had come to the house to check on Pryor, Pryor, armed with a large wooden table leg, threatened to kill him.  Allen Dec., Ex. C, Miller Dep. at 71:2-72:12.  Miller knew that Ayatch had given Peterson a key to the house, but did not recall whether he lived there.  Id. at 72:11-15.

---

[4] The parties' competing transcripts indicate that there is a purported dispute as to whether Ayatch referred to the residence as his mother's house.  Pryor asserts that Ayatch said "my other house," Peterson Rec. Tr. at 8:19-20, rather than "my mother's house," as represented by Defendants' version of the transcript, Peterson Rec. Tr. at 7:18.  Having reviewed the audio recording, the Court determines that there is no ambiguity in the evidence itself and it is not possible to construe the recording in the manner that Pryor proposes.

United States District Court
For the Northern District of California

Ray testified that he was informed of Pryor's erratic behavior, including his threats to kill the officers and his reported threat against Ayatch earlier that day.  Sudano Dec., Ex. 12, Ray Dep. at 156:23-158:5, 173:19-24.  Ray also had been told that Pryor had been involved in a previous altercation with police which had included use of a weapon.  Id. at 159:2-7 ("I believe it was Officer Peterson that told me that Mr. Pryor in the past had fought with officers and there was a mention of a weapon too.").  Ray did not recall, one way or another, whether there were firearms in the home.  Id. at 159:19-20.  However, he was concerned about the possibility of drawing fire when entering the home.  Id. at 159:17-18.

After briefing the other officers at the front of the house, Peterson went to the back of the house where Lt. Clausen and Chief McClain were located.  Allen Dec., Ex. C, Miller Dep. at 72:19-25. Peterson relayed to the group that the residence belonged to Ayatch's and Pryor's mother, Pryor lived there, and Ayatch had a key and visited "quite often."  Peterson Rec., 16:09-17:20. Peterson also reported that Ayatch's mother occasionally asked him to check on his brother, and when he had visited the residence that day, Pryor screamed and threatened to beat, sexually abuse and kill him, while brandishing a table leg.  Id.  Peterson relayed that Ayatch feared for his life.  Id.  An unidentified speaker in the group then reported that Pryor had previously been arrested for resisting arrest and threatening to kill with a machete.  Id.  Clausen reported that a machete was possibly in the house.  Id.

7

**United States District Court**
For the Northern District of California

1   Clausen made the decision that entry into the house was

2   necessary.  Id.  McClain was standing with Clausen at the time and

3   could have reversed Clausen's decision, but did not.  Sudano Dec.,

4   Ex. 10, Clausen Dep. at 175:14-177:6.  Clausen testified that his

5   decision was based on the "totality of what was happening," the

6   property destruction, the report of a fearful mother, the presence

7   of probable cause to make a felony arrest, Ayatch's permission to

8   enter the residence, the officers' possession of a key, Pryor's

9   highly agitated state, uncertainty as to what was occurring in the

10  house and whether Pryor had access to weapons, and Pryor's

11  previous confrontation with the police.  Sudano Dec., Ex. 10,

12  Clausen Dep. at 173:16-23; 185:14-23; Allen Dec., Ex. E, Clausen

13  Dep. at 163:1-7, 177:7-178:12.  Clausen did not suspect that Pryor

14  was mentally ill, but thought that he was under the influence of

15  alcohol or drugs, based on information from Ayatch and his own

16  observations of broken wine bottles in the yard.  Allen Dec., Ex.

17  E, Clausen Dep. at 157:7-16, 169:23-70:11.

18     Miller, Peterson, Ray and Clausen planned to enter the house

19  in order, with Miller entering first, armed with his gun.  Sudano

20  Dec., Ex. 8, Miller Dep. at 82:10-83:22; Allen Dec., Ex. D, Ray

21  Dep. at 165:22-24, 167:10-19.  Ray, entering third, was armed with

22  an X26 taser.[5]

23     The taser video shows that when the door first swung open,

24  Pryor threw a white rag into the doorway and then disappeared from

25  view, apparently running into the hallway.  Pryor then reappeared

26  _____

27     [5] Ray's testimony does not specify the make of the taser or
the mode in which it was used.  However, Defendants concede in

28  their briefing that it was an X26, deployed in dart-mode.

United States District Court
For the Northern District of California

at the entry of the hallway, aggressively raising a stick, just as Miller passed through the doorway and immediately moved to the right inside of the house.  At the same time, several shots can be heard in rapid succession.  Peterson, the next officer after Miller, did not enter the house, but moved to the side, giving Ray, who carried the taser and took the video, a clear line of sight through the open doorway and into the residence.  When the shots were fired, Ray immediately deployed his taser in dart-mode as he moved into the house.  Miller's gunshots and Ray's taser hit Pryor and he fell to the ground.[6]

After Pryor fell to the ground, the video captured only part of his body.  As shown in the video, while Pryor was lying on his back, partially against the left wall, and clearly bleeding, the officers yelled at him repeatedly to roll over on his stomach. When Pryor failed to do so, Ray tased him in dart-mode a second time.  Pryor was not warned that if he failed to roll onto his stomach, he would be tased a second time.  As Ray tased him, the officers continued to yell at Pryor to move onto his stomach.

After the second tasing stopped, Pryor remained on his back. Clausen then shouted, "What's in his hand?"  An unidentified

_____

[6] In deposition, Ray testified that he first deployed his taser because he heard shots fired and saw Miller on the ground inside of the house, but in his post-incident interview Ray stated that he did not see Miller inside of the house until the last gunshot was fired.  Allen Dec., Ex. D, Ray Dep. at 191:1-6; Ray Post-Incident Interview, 27:10-27:25.  Because the video shows that the taser was first deployed during the course of the shooting, Ray may have used his taser before he saw Miller on the ground.  Because of this inconsistency the Court does not consider Ray's testimony that he initiated the tasing because he saw Miller on the ground.

officer approached Pryor, close enough to touch him with his boot and stand over him.  At that point, an officer called out that Pryor "had nothing."  Within seconds thereafter, Clausen called out, "There's a knife!"[7]

Pryor has submitted evidence of Clearlake Police Department policies, as well as opinion testimony by Roger A. Clark concerning police procedures and practices.  Sudano Dec., Exs. 15 and 3.  Policy 414 concerns Hostage and Barricaded Suspects. Under Policy 414.3(a), "the first officer on the scene of an actual or potential hostage/barricade situation shall consider . . . [a]ttempt[ing] to avoid confrontation in favor of controlling and containing the situation until the arrival of trained personnel."  Policy 424.3 states, "If violent acts by the suspect continue, and lives are in imminent danger, a decision to advance on the suspect may be made by the officers at the scene."

Clark opined,

> All officers at the scene, per their POST
> certifications knew the necessary tactics to deal with
> Mr. Pryor in this instance, and had them at hand.
> Absent any exigency, they were required to keep Mr.
> Pryor contained until he willingly exited the
> residence and surrendered to the officers at the
> scene.  Rather the officers all agreed and selected a

---

[7] In deposition, Ray testified that he activated his taser the second time after he heard an officer shout, "[S]how me hands, show me hands," and someone yelled something about a knife.  Allen Dec., Ex. D, Ray Dep. at 193:6-193:9.  Ray stated that he did so because of the warning of a knife, and he did not know whether Pryor possessed or had concealed such a weapon.  Id. at 194:21-24. Ray did not see any weapons after the second tasing.  Sudano Dec., Ex. 12, Ray Dep. at 195:13-196:18.  The Court does not consider this testimony because it is inconsistent with what is evident from the taser video and the evidence must be considered in the light most favorable to Pryor.

United States District Court
For the Northern District of California

course of action that included extremely excessively
provocative and unnecessary force that predictably
resulted shooting [sic] Mr. Pryor. In my opinion, the
fundamental tactical errors and a gross lack of
situational awareness in this incident were the engine
of what occurred. In my experience, a significant
number of civilian deaths involving police result from
a series of cascading departures from expected and
required tactics and deliberate departures from
training.

Sudano Dec., Ex. 3, Clark Report at 10.  Clark further stated that

Clausen and McClain did not follow standards and training

regarding officer contacts with mentally ill subjects.  <u>Id.</u> at 13.

LEGAL STANDARD

Summary judgment is properly granted when no genuine and

disputed issues of material fact remain, and when, viewing the

evidence most favorably to the non-moving party, the movant is

clearly entitled to prevail as a matter of law.  Fed. R. Civ.

P. 56; <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986);

<u>Eisenberg v. Ins. Co. of N. Am.</u>, 815 F.2d 1285, 1288-89 (9th Cir.

1987).

The moving party bears the burden of showing that there is no

material factual dispute.  Therefore, the court must regard as

true the opposing party's evidence, if supported by affidavits or

other evidentiary material.  <u>Celotex</u>, 477 U.S. at 324; <u>Eisenberg</u>,

815 F.2d at 1289.  The court must draw all reasonable inferences

in favor of the party against whom summary judgment is sought.

<u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574,

587 (1986); <u>Intel Corp. v. Hartford Accident & Indem. Co.</u>, 952

F.2d 1551, 1558 (9th Cir. 1991).

Material facts which would preclude entry of summary judgment

are those which, under applicable substantive law, may affect the

outcome of the case.  The substantive law will identify which

facts are material.  Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 248 (1986).

DISCUSSION

I. Section 1983 Claim Against Officers and Chief of Police

    A. Unreasonable Entry in Violation of the Fourth Amendment

        1. Collateral Estoppel

Defendants seek summary adjudication that their entry was

lawful, based on collateral estoppel, or issue preclusion.

Specifically, Defendants argue that Pryor's effort to relitigate

the lawfulness of the officers' entry into the residence is

precluded by a state court ruling denying Pryor's motion to

suppress in criminal proceedings against him.  The parties do not

dispute that state law governs the application of collateral

estoppel by a state court judgment in a federal civil rights

action.  Ayers v. City of Richmond, 895 F.2d 1267, 1270 (9th Cir.

1990).  "In California, a party is generally estopped from

relitigating an issue of fact or law that was conclusively and

necessarily determined in a prior action between the same

parties."  Lombardi v. City of El Cajon, 117 F.3d 1117, 1121 (9th

Cir. 1997) (citing Anderson–Cottonwood Disposal Serv. v. Workers'

Comp. Appeals Bd., 135 Cal. App. 3d 326, 332 (1982)).  Typically,

collateral estoppel will apply "if (1) the issue necessarily

decided at the previous [proceeding] is identical to the one which

is sought to be relitigated; (2) the previous [proceeding]

resulted in a final judgment on the merits; and (3) the party

against whom collateral estoppel is asserted was a party or in

privity with a party at the prior [proceeding]."  Id. (citing
People v. Sims, 32 Cal.3d 468, 484 (1982)).

Here, there is no question that the second and third
requirements for collateral estoppel are satisfied.  Pryor was a
party to both the civil and criminal proceedings, and the criminal
proceeding resulted in a final judgment on the merits in that he
plead no contest to a charge under section 422 of the California
Penal Code, for threats to commit a crime resulting in death, and
he did not appeal the court's denial of his motion to suppress.
See e.g., Ayers, 895 F.2d at 1272 (applying collateral estoppel in
subsequent civil suit where defendant had plead guilty and did not
appeal adverse suppression rulings under California Penal Code
section 1538.5).  With respect to the first requirement, Pryor
argued in his suppression motion that, because the officers
entered his home without a warrant, all evidence obtained after
the purportedly unlawful entry and arrest, including the officers'
observations, should be suppressed.  The prosecution opposed the
motion, asserting that the entry into the home was justified based
on exigent circumstances and the officers' community caretaking
responsibilities.  Given that the motion was denied, the court in
the previous proceeding necessarily resolved the lawfulness of the
entry.  Thus, all three requirements for collateral estoppel were
satisfied.

Pryor responds that Defendants may not assert collateral
estoppel because they did not plead it as an affirmative defense
and did not move to amend their answer.  Magana v. Commonwealth of
Northern Mariana Islands, 107 F.3d 1436, 1446 (9th Cir. 1997), a
case cited by both parties, states that "defendants may raise an

13

affirmative defense for the first time on a motion for summary
judgment only if the delay does not prejudice the plaintiff."

Pryor points out that there are available exceptions to the
application of collateral estoppel under California law.  He cites
an exception where "the issue of probable cause was not litigated
at the preliminary hearing for tactical reasons."  McCutchen v.
City of Montclair, 73 Cal. App. 4th 1138, 1147 (1999).
Defendants, however, assert collateral estoppel based on the
ruling on Pryor's motion to suppress in the criminal action, not
on a preliminary hearing.  There can be no tactical reason for not
litigating the legality of the entry on a motion to suppress, and
Pryor did so.  The court found that the officers' entry into the
residence was lawful.

Exceptions also apply where "the plaintiff alleges that the
arresting officer lied or fabricated evidence presented at the
preliminary hearing . . . [or] where it is apparent from the
record that the evidence presented at the preliminary hearing was
not the same as the evidence available to the arresting officer."
Id.  Pryor claims that permitting Defendants to raise the defense
of collateral estoppel at this late stage would result in
prejudice because he has not conducted discovery that may have
established that one of these exceptions applies.  Pryor notes
that he has not procured the transcript of the hearing on the
motion to suppress and has not deposed the witnesses whom the
prosecution called at the hearing, Peterson and District Attorney
Investigating Officer John Flynn.

Nevertheless, Pryor has not shown any likelihood that either
exception applies in this case.  Although Pryor's counsel contend

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

that the absence of the transcript thwarts their ability to argue these exceptions, they have not demonstrated that they could not have obtained a transcript before Pryor's opposition to Defendants' motion for summary judgment was due.  Pryor's generalized contention that officers from the CPD are dishonest is not sufficient to justify delaying this action to allow Pryor to obtain a transcript and depose Peterson and Flynn in the hopes of finding that they might have lied at the suppression hearing. Thus, Pryor's contention that one of these exceptions might apply is speculative, and he has not demonstrated that he was prejudiced by Defendants asserting collateral estoppel in their motion for summary judgment.

Pryor is precluded from relitigating the lawfulness of the officers' entry into his home.

### 2. Lawfulness of the Officers' Warrantless Entry

Even if collateral estoppel did not apply, Defendants are entitled to summary adjudication that the officers' entry into Pryor's home was lawful.

The Fourth Amendment generally prohibits warrantless entry of a person's home, whether to make an arrest or to conduct a search, unless an exception to the warrant requirement, such as consent, emergency or exigency, applies.  Espinoza v. City and Cnty. of San Francisco, 598 F.3d 528, 533 (9th Cir. 2010).  Defendants argue that the officers' entry into the home was lawful based on Ayatch's consent, exigent and emergency circumstances, and the probable cause that they had to arrest Pryor for violation of three different provisions of the penal code.

15

United States District Court
For the Northern District of California

The Fourth Amendment's warrant requirement does not apply to an officer's entry into a person's home in situations in which voluntary consent has been obtained from the individual whose property is searched, Schneckloth v. Bustamonte, 412 U.S. 218 (1973), or "from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." United States v. Matlock, 415 U.S. 164, 171 (1974). A third party's common authority rests on his or her "mutual use of the property [and] joint access or control for most purposes." Id. at 171 n.7 (alterations added). "Under the apparent authority doctrine, a search is valid if the government proves that the officers who conducted it reasonably believed that the person from whom they obtained consent had the actual authority to grant that consent." United States v. Davis, 332 F.3d 1163, 1170 (9th Cir. 2003). The "determination of consent to enter must be judged against an objective standard: would the facts available to the officer at the moment warrant a man of reasonable caution in the belief that the consenting party had authority over the premises?" Illinois v. Rodriguez, 497 U.S. 177, 188 (1990).

Pryor argues that Ayatch lacked apparent common authority to consent to the officers' entry into the home. The basis for Ayatch's apparent common authority to consent is his exchange with Peterson. It is undisputed that Ayatch told Peterson the following: (1) he formerly lived at the residence, which belonged to his mother, (2) he was able to come and go from the residence whenever he pleased, (3) his mother sometimes asked him to talk to Pryor, who lived at the residence, (4) Pryor was on drugs, (5) his

mother "couldn't take it" and had to leave the residence, and
(6) when Ayatch entered the home, Pryor threatened to kill him.
Ayatch had a key to the residence and asked the police whether
they needed a key.  Ayatch also told Peterson that, although
Pryor's mother did not specifically ask him to check on Pryor that
day, he decided to do so.

Pryor asserts that Ayatch did not have apparent common
authority to consent to the officers' entry into the house because
Ayatch did not live there and his mother had not asked him to
check on Pryor that particular day.

In United States v. Ayoub, 498 F.3d 532, 537-39 (6th Cir.
2007), a case upon which Defendants rely, the Sixth Circuit found
that the homeowners' daughter had common authority and "at
minimum" apparent authority to consent because she had a key to
the residence, lived nearby and was the caretaker of the residence
while her parents were out of the country.  The defendant, Ayoub,
who argued that the daughter lacked authority to consent, was the
son of the homeowners.  The decision does not indicate whether or
not Ayoub actually resided at the house, but the court noted that
he was seen "going to and from the house."  Id. at 540.  The court
held that, even assuming Ayoub could have asserted an interest in
the home that "eliminated" the daughter's authority to consent to
the search, he never denied consent.  Id.  While the officers were
removing marijuana from the rafters of the garage, Ayoub arrived,
exited his car, removed his shirt and spun around in circles,
proclaiming, "The weed is mine.  Take me to jail.  You ruined my
life."  Id. at 536.  Thus, Ayoub supports a finding that Ayatch
had apparent common authority to consent to the officers' entry

United States District Court
For the Northern District of California

17

1  into the residence, but the present case differs in that Pryor

2  erratically objected to the officers' entry into the residence.

3     Relying on Georgia v. Randolph, 547 U.S. 103 (2006), Pryor

4  argues that the officers did not have consent to enter the home

5  because he told the officers to leave and refused to consent to

6  their entry.  In Randolph, a wife complained to the police that,

7  after a domestic dispute, her husband took their son away from the

8  home.  The wife and son had recently returned to the home after

9  she had separated from her husband and had taken her son to Canada

10  for several weeks.  When officers reached the house, she told them

11  that her husband used cocaine and his habit caused financial

12  troubles.  When the husband returned to the scene, he denied

13  cocaine use and stated that he had removed their son to a

14  neighbor's house because he wanted to prevent his wife from

15  leaving the country again with their son.  The husband refused to

16  allow the police into the home to search for evidence of cocaine

17  use, but the wife consented to the search.

18     The Court held that the officers' warrantless entry into the

19  home to conduct the search violated the Fourth Amendment because a

20  co-tenant lacks authority to give consent over a present,

21  objecting co-tenant.  Id. at 114-15.  In so holding, however, the

22  Court stated that "this case has no bearing on the capacity of the

23  police to protect domestic violence victims."  Id. at 118.  The

24  Court explained,

25          The dissent's argument rests on the failure to
            distinguish two different issues: when the police may
26          enter without committing a trespass, and when the
            police may enter to search for evidence.  No question
27          has been raised, or reasonably could be, about the
            authority of the police to enter a dwelling to protect
28

18

> a resident from domestic violence; so long as they have good reason to believe such a threat exists, it would be silly to suggest that the police would commit a tort by entering, say, to give a complaining tenant the opportunity to collect belongings and get out safely, or to determine whether violence (or threat of violence) has just occurred or is about to (or soon will) occur, however much a spouse or other co-tenant objected . . . Thus, the question whether the police might lawfully enter over objection in order to provide any protection that might be reasonable is easily answered yes.

Id. (internal citations omitted)

In making this explanation, the Court cited with approval a treatise's observation that

> even when . . . two persons quite clearly have equal rights in the place, as where two individuals are sharing an apartment on an equal basis, there may nonetheless sometimes exist a basis for giving greater recognition to the interests of one over the other . . . . [W]here the defendant has victimized the third-party . . . the emergency nature of the situation is such that the third-party consent should validate a warrantless search despite defendant's objections."

Id. (quoting 4 LaFave, Search and Seizure: A Treatise on the Fourth Amendment, § 8.3(d)) (alterations in original).

Thus, Randolph does not foreclose Defendants from entering the residence based on Ayatch's consent, over the objections of his brother, who was suspected of domestic violence, provided that the officers had "good reason" to believe that such a threat existed and the brothers were on equal footing with regard to

their rights in the residence.[8]  The officers had a reasonable

belief that there was a risk of imminent violence.  Ayatch

reported to Peterson that Pryor had threatened his life, was on

drugs and drove his mother from their residence.  The officers

could hear Pryor screaming, destroying property in the residence,

and threatening to kill them.

The brothers were on equal footing, in the sense that they

were two adult sons who had access to their mother's residence by

virtue of her permission.  Although Ayatch was not a resident of

the property at that time, and Pryor was, Ayatch had informed

Peterson that he formerly lived there, had a key, and could come

and go every day, whenever he pleased.  The Supreme Court has

recognized that the "authority which justifies the third-party

consent does not rest upon the law of property, with its attendant

historical and legal refinements," but rests instead on mutual use

of the property and joint access or control for most purposes.

Matlock, 415 U.S. at 171 n.7.

_____

[8] Pryor also relies on United States v. Purcell, 526 F.3d 953
(6th Cir. 2008), to argue that apparent common authority was
lacking.  In Purcell, the Sixth Circuit held that apparent
authority was lacking because the officers searched a backpack in
a motel room based on a woman's consent when it was questionable
that she had authority to consent to the search.  Id. at 963-65.
The woman had given consent to search a number of bags in the
room.  After the officers searched a duffel bag and it contained
men's clothing and none of the woman's personal effects, they
proceeded to search a backpack, relying on the woman's consent.
The court concluded that the search was unreasonable because the
officers could have resolved the ambiguity by further questioning
the woman, who stood outside of the room, to confirm whether she
had authority to consent, but they failed to do so.  Id. at 964.
However, Purcell is inapposite because it did not involve a threat
of imminent violence.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Thus, the officers, at the time, had sufficient grounds to believe that Ayatch had common authority to consent to their entry into the house for the purpose of containing Pryor.  In addition, the officers reasonably believed that Ayatch's consent overrode Pryor's objections, given the threat of violence they detected, Pryor's destructive behavior, and indications that both brothers were present at the residence based on their mother's permission.

Defendants also argue that the entry into the home was lawful on the grounds that exigent and emergency circumstances existed. The "emergency exception stems from the police officers' community caretaking function and allows them to respond to emergency situations that threaten life or limb." Hopkins v. Bonvicino, 573 F.3d 752, 763 (9th Cir. 2009) (internal quotation marks omitted). "By contrast, the exigency exception does derive from the police officers' investigatory function; it allows them to enter a home without a warrant if they have both probable cause to believe that a crime has been or is being committed and a reasonable belief that their entry is necessary to prevent the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts." Id. (internal quotation and alteration marks omitted). The Supreme Court recently reiterated that "reasonableness 'must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight' and that '[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving.'" Ryburn v. Huff, 132 S. Ct. 987, 992 (2012) (per

curiam) (quoting Graham v. Connor, 490 U.S. 386, 396–397 (1989).
Defendants do not assert that Pryor was threatening to escape the
scene or destroy evidence.  However, an emergency existed because
Pryor posed a threat to officers and civilians at the scene.  In
particular, Pryor had threatened to kill his brother and the
officers, he was reportedly under the influence of drugs and he
appeared to be acting in a destructive manner.  There was a risk
that Pryor had a machete, and the officers were informed that
Pryor's mother had been driven out of the residence.  In Ryburn,
the Court found that officers' warrantless entry into a home was
reasonable based on an imminent threat of violence where there was
a rumor that a teenager had threatened to shoot up his school and,
when officers visited his home to investigate, his mother acted
suspiciously and immediately turned and ran into her house upon
being asked if there were guns in the house.  Id. at 991.  Here,
too, the officers were justified based on the community caretaking
exception in entering the residence without a warrant for the
purpose of curbing Pryor's dangerous and destructive behavior.

Pryor argues that the circumstances did not necessitate
immediate entry into the house and that CPD policies and expert
evidence demonstrate that it was unreasonable for the officers to
enter without further investigating or calling for a SWAT team.
This argument is not persuasive.

First, Pryor has not established that policies were violated.
Policy 424 notes that officers may use force necessary to protect
themselves or others from serious injury.  Even if policies were
violated, that is not evidence that the officers' conduct was
unreasonable and, thus, unconstitutional.  Pryor's expert

1   concluded that the officers were unreasonable in failing to pursue

2   self-surrender tactics.  Clausen believed that, once inside the

3   residence, the officers could coax Pryor into coming out.  The

4   expert's opinion suggests that a different decision could have

5   been made, but is not evidence that the entry was unreasonable.

6        Pryor's claims against Miller and Ray, on the grounds that

7   they unlawfully entered the residence, and against McClain and

8   Clausen, on the grounds that they ordered the entry, are summarily

9   adjudicated in Defendants' favor.

10       B. Excessive Force

11       Defendants seek summary adjudication that no reasonable jury

12  could find that Ray's tasing of Pryor amounted to unreasonable

13  force under the Fourth Amendment and that, even if it did, Ray is

14  qualifiedly immune.  Defendants also seek summary adjudication

15  that there is no evidence to support a finding that McClain or

16  Clausen participated in any use of excessive force against Pryor.

17       Under Graham v. Connor, courts considering an excessive force

18  claim under the Fourth Amendment ask "whether the officers'

19  actions are objectively reasonable in light of the facts and

20  circumstances confronting them."  490 U.S. at 397 (internal

21  quotation marks omitted).  Courts are required to balance "the

22  nature and quality of the intrusion on the individual's Fourth

23  Amendment interests against the countervailing governmental

24  interests at stake."  Id. at 396 (internal quotation marks

25  omitted).

26       The government's interest in the use of force is evaluated

27  "by examining three core factors, the severity of the crime at

28  issue, whether the suspect poses an immediate threat to the safety

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. . . These factors, however, are not exclusive." Id. (citing Graham, 490 U.S. at 396) (internal quotation marks omitted).  The Ninth Circuit requires courts to examine the totality of the circumstances and consider whatever specific factors may be appropriate in a particular case, whether or not listed in Graham.  Id.  The "most important single element" of the three factors specified in Graham is "whether the suspect poses an immediate threat to the safety of the officers or others."  Smith v. City of Hemet, 394 F.3d 689, 702 (9th Cir. 2005) (quoting Chew v. Gates, 27 F.3d 1432, 1441 (9th Cir. 1994)).

In the Ninth Circuit, the use of a X26 taser in dart mode has recently been held to constitute an "intermediate, significant level of force that must be justified by the governmental interest involved," due to the intense pain "felt throughout the body . . . effectively commandeering the victim's muscles and nerves."  Bryan v. MacPherson, 630 F.3d 805, 825-26 (9th Cir. 2010).

Defendants argue that Ray's first and second firing of his taser was reasonable.

Ray's use of the taser must be justified by the governmental interest at stake at the time he deployed the weapon.  Relevant to the severity of the crime that the officers encountered, Pryor was charged with attempted arson, assaulting a peace officer with a deadly weapon, resisting arrest and making death threats against Ayatch.  He eventually plead guilty to threatening to commit a crime resulting in death, under California Penal Code section 422. This is a serious crime, which includes a sentence of up to one

year in county jail or a maximum of three years in state prison. However, the crime's severity is mitigated by the fact that it was not accompanied by action.  Because Pryor had used a stick or table leg to threaten his brother, at the time that the officers had arrived and Pryor's brother was outside of the residence, Pryor was not in a position to act on his threat immediately.

However, Ray first fired his taser when he heard shots being fired.  Although Ray did not know at that moment whether Pryor was firing a weapon, before entering the home he considered the possibility that Pryor could have access to firearms.  There was little time for Ray to determine for certain whether Pryor was firing a gun.  Given the danger posed by gunfire, there existed a strong governmental interest in ensuring that Pryor was immobilized.  Thus, a reasonable jury could not find that Ray violated the Fourth Amendment when he first fired the taser.

Pryor also argues that a jury could find that Ray's first tasing was unreasonable because it was provoked by Miller's use of excessive force in shooting Pryor, but this argument is not persuasive.  In Billington v. Smith, 292 F.3d 1177, 1189 (9th Cir. 2002), the Ninth Circuit stated that "where an officer intentionally or recklessly provokes a violent confrontation, if the provocation is an independent Fourth Amendment violation, he may be held liable for his otherwise defensive use of deadly force."  This principle was recently applied in Glenn v. Washington County, 2011 WL 6760348, *13 (9th Cir.), a case upon which Pryor relies.

In Glenn, two officers were sued for fatally shooting a teenager.  Both officers arrived at the teenager's home after his

**United States District Court**
For the Northern District of California

mother reported that he was heavily intoxicated, breaking windows and threatening to kill himself with a pocketknife.  The officers immediately aimed their service weapons at the teenager, who was standing outside of his home, and screamed at him in an excited, frantic manner to drop the knife.  When a third officer arrived at the scene, armed with a beanbag gun, one of the officers immediately ordered him to shoot beanbags at the teenager. Neither of the two defendant officers carried a taser or asked the third officer whether he had a taser.  Both defendant officers determined that they would use deadly force if the teenager moved towards his house.  After the teenager was shot with the beanbag rounds by the third officer, the teenager took one or two steps towards his house, and the two defendant officers shot and killed him.

Weighing the Graham factors, the Ninth Circuit found sufficient evidence that the firing of beanbag rounds amounted to excessive force.  The court also found evidence that the unreasonable use of that less-than-lethal force precipitated the defendant officers' use of deadly force.  The court determined that a reasonable jury could find that the defendant officers' rapid escalation of the situation was unreasonable.

This case, however, is distinguishable.  Although Ray acknowledged that he first tased Pryor as a result of the shooting, there is no evidence that Ray participated in Miller's decision to shoot Pryor.  Miller acted independently in shooting Pryor.  There is no evidence that unreasonable conduct by Ray set in motion a chain of events that led to Miller shooting Pryor and then Ray tasing him.  In contrast, in Glenn, both defendant

**United States District Court**
For the Northern District of California

officers participated in escalating the confrontation to the point that they were provoked into using lethal force.

With respect to the second tasing, the governmental interest differs in that, at the moment it was done, Pryor was on the ground, shot and bleeding.  The taser video shows that Ray fired his taser a second time before Clausen asked what was in Pryor's hands and shouted that he saw a knife.  Ray did not see Pryor holding a knife or a table leg.  Id. at 196:8-18.  Ray tased Pryor a second time when Pryor failed to comply with orders that he roll over onto his stomach.  Finally, Ray did not warn Pryor that he would be tased a second time if he did not roll onto his stomach.  See Bryan, 630 F.3d at 831 (noting "that police officers normally provide such warnings where feasible . . . and that the failure to give such a warning is a consideration" in weighing the use of reasonable force).  Ray could be found to have acted unreasonably in the second tasing because he used what has now been held to be an intermediate level of force, although by that time Pryor did not appear to pose an immediate threat to the safety of the officers or others and was not actively resisting arrest or attempting to evade arrest by flight.

However, Defendants argue that, even if Ray's conduct was unreasonable, he is protected by qualified immunity.  "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Pearson v. Callahan, 555 U.S. 223, 231 (2009) (internal quotation marks omitted).  "Qualified immunity balances two important interests--the need to

**United States District Court**
For the Northern District of California

hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Id.

To determine whether qualified immunity applies, courts employ a two-step test: "first, we decide whether the officer violated a plaintiff's constitutional right; if the answer to that inquiry is 'yes,' we proceed to determine whether the constitutional right was 'clearly established in light of the specific context of the case,' at the time of the events in question." Mattos v. Agarano, 661 F.3d 433, 440 (9th Cir. 2011) (en banc) (citing Robinson v. York, 566 F.3d 817, 821 (9th Cir. 2009)). It is within the court's discretion which of the two prongs of the analysis should be addressed first. Saucier v. Katz, 533 U.S. 194, 201 (2001).

Defendants point out that the tasing occurred before the Ninth Circuit decisions in Bryan, 630 F.3d at 805, and Mattos, 661 F.3d at 433, issued in 2010 and 2011, respectively. In Bryan, the court found that, viewing the facts in the light most favorable to the non-moving party, the defendant police officer used excessive force when he fired a taser in dart-mode at a clearly unarmed man, who had been pulled over for a seat-belt law infraction and was standing outside his vehicle having a bizarre, but stationary, tantrum. 630 F.3d at 831-32. The court, however, concluded that the officer was qualifiedly immune because, although case law placed the officer on fair notice that an intermediate level of force was unjustified, no Supreme Court or Ninth Circuit case, as of July 24, 2005, established that use of a taser, such as an X26

in dart mode, constituted an intermediate level of force.  <u>Id.</u> at

833.  Indeed, <u>Bryan</u> was the first Ninth Circuit case to announce

such a rule and did so after the incident at issue in this case

occurred.  Because Ray's conduct did not violate any clearly

established constitutional law, he is entitled to qualified

immunity as to that act.

In sum, Ray is entitled to summary judgment on Pryor's claim

that the first tasing amounted to excessive force.  He is

qualifiedly immune from liability for the second tasing, as well

as for the first.

As noted earlier, Defendants seek summary adjudication that

neither Clausen nor McClain were integral participants in any use

of excessive force against Pryor.  Pryor contends that both men

set in motion a series of acts by others, or knowingly refused to

terminate a series of acts by others, which they knew or

reasonably should have known would cause Ray and Miller to use

excessive force.  <u>See</u> <u>Larez v. City of Los Angeles</u>, 946 F.2d 630,

646 (9th Cir. 1991).

Pryor's expert has opined that Clausen and McClain

disregarded standards and training regarding officer contacts with

mentally ill subjects.  However, Pryor has not pointed to evidence

indicating that Clausen or McClain knew or should have known that

Pryor was mentally ill.  Clark's conclusory statement that "it was

clear from the onset of the officer's arrival that Mr. Pryor was

suffering from a mental illness" fails to demonstrate that either

man had personal knowledge of Pryor's mental condition.  Clark's

report also indicates that a prior incident in which Pryor was

involved resulted in his arrest and listing in the Law Enforcement

29

Data Systems as a mentally incompetent person. Sudano Dec., Ex. 3, Clark Report at 6. Clark noted that the Clearlake Police Department had access to this data system, and the officers could have instantly accessed the information themselves or through the department dispatcher. Id. According to Clark, all officers in California are trained on the existence and use of this data system. However, Clark acknowledges that the officers received information about Pryor from the department dispatcher, but that information did not include his mental condition. Clark does not opine, and Pryor has not pointed to authority, that constitutional standards required Clausen and McClain, or any of the officers at the scene, independently to check the data system about the suspect, when dispatchers who had access to that information had already communicated with the responding officers.

Pryor has not produced sufficient evidence to raise a disputed issue of material fact that Clausen or McClain set in motion a series of acts or knowingly refused to terminate a series of acts by others, which they knew or should have known would cause Ray and Miller to use excessive force. Thus, summary judgment in favor of Clausen and McClain is warranted.

C. Due Process

Defendants move for summary judgment as to Pryor's claims under the due process clauses of Fifth and Fourteenth Amendments. Pryor does not dispute Defendants' contention that due process under the Fifth Amendment governs only the conduct of federal officers. Nor has Pryor opposed Defendants' argument that his claim under the Fourteenth Amendment is not actionable because his allegations of an unconstitutional entry into his home and use of

30

United States District Court
For the Northern District of California

excessive force are covered by a more specific provision, the
Fourth Amendment.  Indeed, the Supreme Court has stated that,
because it has "always been reluctant to expand the concept of
substantive due process" under the Fourteenth Amendment, where a
particular "Amendment provides an explicit textual source of
constitutional protection against a particular sort of government
behavior, that Amendment, not the more generalized notion of
substantive due process" must be the guide for analyzing such
claims.  <u>County of Sacramento v. Lewis</u>, 523 U.S. 833, 842 (1998).

Accordingly, Defendants are entitled to summary judgment as
to Pryor's due process claims.

D. Equal Protection

Defendants seek summary adjudication as to Pryor's § 1983
claim based on a violation of equal protection principles due to
his mental illness and race.

"To prevail on its claim under the equal protection clause of
the Fourteenth Amendment, a plaintiff must demonstrate that [the
government's law] enforcement had a discriminatory effect and the
police were motivated by a discriminatory purpose."  <u>Rosenbaum v.
City & Cnty. of San Francisco</u>, 484 F.3d 1142, 1152 (9th Cir. 2007)
(citing <u>Wayte v. United States</u>, 470 U.S. 598, 608 (1985)).  To
establish a discriminatory effect, the claimant must show that
similarly situated individuals were treated differently.  <u>See</u> <u>id.</u>
at 1153.  To show discriminatory purpose, a plaintiff must
establish that the decision-maker selected or reaffirmed a
particular course of action at least in part "because of," not
merely "in spite of," its adverse effects upon an identifiable
group.  <u>Id.</u>

United States District Court
For the Northern District of California

Pryor's equal protection claim warrants summary adjudication in favor of Defendants because he has presented no evidence that similarly situated individuals were treated differently or that Defendants pursued a course of action because of his race or mental illness.  First, there is no evidence that Defendants were aware of Pryor's mental illness prior to the incident.  Second, Peterson's alleged statements to Pryor, shortly before the shooting and tasing, that he did not talk to his "kind," or his "people," fail to establish Defendants' racial animus.  Peterson was not named as a Defendant and there is no evidence that Defendants harbored racial hostility at the time of the incident. Pryor's reliance on an admission of Officer Todd Miller, who is not a defendant and did not participate in this incident, that he told an African American that he did not like his "kind" and that he should "move" is similarly insufficient.  Third, Defendant Carl Miller's later posting on Facebook about a "habib," while evidence of racial insensitivity, would not support a reasonable jury's finding that Defendant Carl Miller intended to harm Pryor because of his race.

Defendants are entitled to summary judgment with respect to the § 1983 claim to the extent it is based on an equal protection violation.

E. Zone of Privacy under the Fourth and Ninth Amendments

Defendants request summary adjudication with respect to Pryor's § 1983 claim alleging violations of his zone of privacy claim under the Fourth and Ninth Amendments.  Because Pryor has not opposed on this point, this aspect of his claim is adjudicated against him.

32

II. Section 1983 Claims Against the City

Pryor's § 1983 claim against the City can only be brought in accordance with Monell v. Department of Social Services, 436 U.S. 658, 690-91 (1978).  Although a city may not be held vicariously liable for the unconstitutional acts of its employees on the basis of an employer-employee relationship with the tortfeasor, it may be held liable under Monell when a municipal policy or custom causes an employee to violate another's constitutional right.  Id. at 691-92.

The Ninth Circuit has stated that municipal liability under Monell may be established in one of three ways: (1) "the plaintiff may prove that a city employee committed the alleged constitutional violation pursuant to a formal governmental policy or a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity;" (2) "the plaintiff may establish that the individual who committed the constitutional tort was an official with final policy-making authority and that the challenged action itself thus constituted an act of official governmental policy;" or (3) "the plaintiff may prove that an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it." Gillette v. Delmore, 979 F.2d 1342, 1346-47 (9th Cir. 1992).  Under Monell, a city can only be held liable under § 1983 where its policy or custom is the "moving force behind the constitutional violation." City of Canton v. Harris, 489 U.S. 378, 389 (1989) (alterations omitted).

Pryor argues that the City has several informal customs that led to the violation of his constitutional rights.  Specifically,

33

Pryor contends that the City's unconstitutional customs comprise negligent training, negligent hiring, and tolerating within the police force known bigotry, substance abuse, and deliberate indifference to the mentally disabled.

It is well established that a city may be held liable, pursuant to § 1983, for failure to train its employees. Id. However, "[o]nly where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." Id. City of Canton explains,

> In resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform . . . Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct.

Id. at 390-91.

Pryor has presented insufficient evidence to support his contention that negligent training led to the violation of his constitutional rights.  Pryor's expert, Clark, does not opine that the officers were inadequately trained as to the safe apprehension of mentally impaired and barricaded subjects.  Although Clark stated that "inadequate training and ratification of the shooting of Mr. Pryor is very alarming," Sudano Dec., Clark Report at 11, and he found "no evidence that any of the officers were either disciplined or at a minimum retrained in proper arrest methods, tactical deployments or use of force," id., his report did not

34

identify or discuss any specific inadequacy in the department's training program. Rather, Clark contends that the officers "knew better" than to use their chosen tactics by virtue of their training and established standards. That the officers failed to follow certain established policies is not sufficient to infer that the City's training program was inadequate and constituted the moving force behind violations of Pryor's constitutional rights.

Pryor also asserts that the City had a custom of negligent hiring. Pryor cites his expert's report in support of this assertion. However, neither the particular citation nor Clark's report discusses a custom or long-standing practice of negligent hiring by the department. The hiring of Miller and Ray alone, even if contrary to departmental policies, is not sufficient to prove a custom of negligent hiring.

Furthermore, Pryor lacks evidence that the hiring decisions, even if amounting to a policy of deliberate disregard for the constitutional rights of Clearlake residents, were "closely related" to his ultimate injury. See City of Canton, 489 U.S. at 391 (noting that "for liability to attach . . . the identified deficiency in a city's [policy] must be closely related to the ultimate injury."). Pryor presents evidence Miller was hired contrary to certain CPD hiring policies. However, under City of Canton, it is not sufficient to show that the shooting would not have occurred if Miller had not been hired. Rather, Pryor must show that Miller's lack of qualifications for his position was the moving force behind the violation of Pryor's constitutional rights. Clark's report notes that Miller's blood test, taken

35

**United States District Court**
For the Northern District of California

immediately after the shooting, indicated a presumptively positive result for Benzadiazepine.  Miller acknowledged taking this prescribed drug to relieve hand tremors.  It is not evident that Miller's hand tremors or his use of Benzadiazepine should have disqualified him from employment.  In addition, Pryor has submitted evidence about Miller's conduct in the past, but he has not pointed to evidence that such conduct continued to the present or that it was implicated in the shooting.  Despite Miller's past conduct and his admitted consumption of approximately two glasses of wine the day before, Pryor has failed to produce evidence that this precipitated any excessive force.  There is no basis for the Court to infer that CPD's decision to hire Miller despite his past conduct led to a violation of Pryor's constitutional rights.

Likewise, Pryor has failed to point to any evidence connecting Ray's pre-employment conduct and the incident at hand.

Finally, the decision to enter the residence was made by Clausen and ratified by McClain, after a discussion with Peterson. Pryor has not pointed to evidence that negligent hiring of Miller and Ray was the driving force for the entry into the residence. In sum, the record is insufficient to support Pryor's <u>Monell</u> claim on a theory of negligent hiring.

Similarly, Pryor's <u>Monell</u> claim based on the CPD's alleged custom of tolerating substance abuse fails because the evidence submitted, including Facebook postings about alcohol use from Miller's social circle, does not evidence an actionable custom. Furthermore, Pryor has not demonstrated how such a custom, even if established, caused his injury.

**United States District Court**
For the Northern District of California

1   Pryor also contends that his constitutional rights were

2   violated by a "custom of known bigotry."  Pryor asserts that posts

3   on Facebook among Miller and department personnel and officers

4   demonstrate the department's indifference to derogatory remarks.

5   Pryor has not presented authority indicating that such

6   indifference amounts to a cognizable custom for purposes of a

7   Monell claim.  Evidently, only two of Miller's CPD Facebook

8   friends, Sergeant Brenda Crandall and Nick Bennett, Miller's

9   background investigator, may have had supervisory responsibility

10  over him.  Moreover, even if such indifference amounted to a

11  custom or long-standing practice, Pryor has not produced evidence

12  that the department's failure to reprimand officers for derogatory

13  remarks constituted the moving force that led to his injury.

14      The City is entitled to summary judgment as to Pryor's Monell

15  claim.

16  III. Assault and Battery

17      Defendants McClain, Clausen and Ray seek summary adjudication

18  of Pryor's battery and assault claims against them.  In a claim

19  for battery by a peace officer, under California law, a plaintiff

20  must prove that (1) the defendant intentionally touched the

21  plaintiff, (2) the defendant used unreasonable force to arrest,

22  prevent the escape of, or overcome the resistance of the

23  plaintiff, (3) the plaintiff did not consent to the use of that

24  force, (4) the plaintiff was harmed, and (5) the defendant's use

25  of unreasonable force was a substantial factor in causing the

26  plaintiff's harm.  Judicial Council of California, Civil Jury

27  Instruction 1305.  See also Edson v. City of Anaheim, 63 Cal. App.

28  4th 1269, 1272 (1998).  A claim for assault requires, among other

37

elements, proof that the defendant threatened to touch the plaintiff in a harmful or offensive manner.  Judicial Council of California, Civil Jury Instruction 1301.

McClain is entitled to summary adjudication on this claim because there is no evidence that he threatened or touched Pryor. Clausen is entitled to summary adjudication on this claim because he touched Pryor only to stop his bleeding.  Allen Dec., Ex. E, Clausen Dep. at 223:9-19.  Pryor has not produced evidence that he was harmed by Clausen's touching or that he did not consent to it. There is no evidence that Clausen threatened to touch him.

If Pryor establishes that Ray used excessive force in tasing him a second time, then Ray may be individually liable for battery.  However, Pryor has not provided evidence that Ray threatened him with use of unreasonable force.  Ray is entitled to summary adjudication of the assault claim against him, but not the battery claim.

                              CONCLUSION

The Court grants Defendants' unopposed motion for summary judgment with respect to Pryor's claims for intentional infliction of emotional distress; negligence; common law negligent hiring, training, supervision and discipline; and violations of California Civil Code sections 52.1 and 51.7 and the ADA and Rehabilitation Act.

Summary judgment in favor of the City is granted with respect to Pryor's Monell claim against it.

Defendants' motion for summary judgment as to Pryor's § 1983 claim is granted as follows.  The officers' entry into the home was lawful.  Ray is entitled to summary judgment as to the § 1983

**United States District Court**
For the Northern District of California

claim based on excessive force: Pryor's evidence is insufficient
to support a claim against Ray as to the first tasing and, even if
the second tasing was wrongful, Ray is qualifiedly immune from
liability.  McClain and Clausen are also entitled to summary
judgment on Pryor's § 1983 claim for excessive force.  Summary
judgment is granted in favor of Defendants as to the § 1983 claim
based on violations of due process, equal protection and privacy
rights.

McClain and Clausen are entitled to summary judgment on the
assault and battery claims.  Ray is entitled to summary
adjudication of the assault claim, but not the battery claim.

Defendants do not move for summary adjudication of Pryor's
claim against Miller of excessive force.  Thus, the § 1983 claim
against Miller based on his alleged use of excessive force will be
tried to a jury, along with Pryor's battery claim against Ray.

On November 4, 2011 the parties convened for an unsuccessful
mediation session with William Simmons.  Mr. Simmons noted in his
Certification of the ADR session that the ADR process was not
complete.  The parties shall meet for a further settlement
conference with Mr. Simmons or with a magistrate judge on a date
prior to the Final Pretrial Conference, which is scheduled for
September 19, 2012.  The parties shall file a notice, within a
week, that they have scheduled a settlement conference with Mr.
Simmons.  If they do not, the Court will refer the case to a
magistrate judge for a settlement conference.

IT IS SO ORDERED.

Dated:  Õ|→]ÁÍJÊÁG€FG

_____
CLAUDIA WILKEN
United States District Judge